UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

AMBER KLOHA MANSFIELD,

Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

Defendant.

_____/

Civil Action No.: 14-11766
Honorable Arthur J. Tarnow
Magistrate Judge Elizabeth A. Stafford

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 16, R. 19]

Plaintiff Amber Kloha Mansfield ("Mansfield") appeals a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which were referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court finds that the ALJ erred by failing to adhere to the treating physician rule with respect to one of Mansfield's treating physician's opinions, in failing to recontact another treating physician, and in assessing Mansfield's residual functional capacity without the support of

substantial evidence in the record.  For these reasons, the Court

**RECOMMENDS** that the Commissioner's motion **[R. 19]** be **DENIED**,

Mansfield's motion **[R. 16]** be **GRANTED IN PART** to the extent it seeks

remand but **DENIED IN PART** to the extent it seeks reversal and an award

of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the

Commissioner's decision be **REMANDED** for further proceedings

consistent with this Report and Recommendation.

## I.   BACKGROUND

At the time of the hearing, Mansfield was a 25-year-old mother of

three who had been in special education classes from the sixth grade until

the eleventh grade, her last year of school.  [R. 9-2,Tr. 64-5].  She had

previously worked in day care, as a janitor and as a cashier.  [R. 9-6, Tr.

246].  Mansfield alleges that she stopped working because of her

"condition(s)" and "back pain."  [*Id.,* Tr. 245; R. 9-7, Tr. 476].  She claims

that she is disabled by back problems, sleep problems, bipolar disorder and

other mental health problems.  [R. 9-6, Tr. 245].

### A.   Procedural History

On February 23, 2011, Mansfield filed applications for DIB and SSI,

alleging disability as of March 1, 2009.  [R. 9-5, Tr. 186-200].  The claims

were denied initially on June 27, 2011, and Mansfield filed a timely request

for an administrative hearing.  [R. 9-4, Tr. 134-53; 156-57].  Mansfield and a vocational expert (VE) testified at the January 4, 2012 hearing before an administrative law judge (ALJ").  [R. 9-2, Tr. 58-87].  In a written decision dated March 1, 2012, the ALJ found Mansfield not disabled.  [*Id.,* Tr. 33-57].  On May 25, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of this review.  [*Id.,* Tr. 26-28].  Mansfield filed for judicial review of the final decision on May 2, 2014.  [R. 1].

### B.   Evidence in the Record

#### 1.   *Mansfield's Testimony and Subjective Reports*

Mansfield reported being 5'3" tall and weighing 176 pounds.  [R. 9-6, Tr. 245].[1]  She complained of a bulging disc in her back, causing pain at a level of 6/10 and numbness that extends down her legs.  [R. 9-2, Tr. 81; R. 9-6, Tr. 251].  She stated that the pain affects her ability to sit, stand, walk, lift, carry, and climb stairs.  [R. 9-2, Tr. 66-67; R., 9-6, Tr. 267; 272]. Mansfield's boyfriend reported that she cannot sit, stand or lay for any longer than a few minutes at a time.  [R. 9-6, Tr. 292].  However, she testified she could lift about 10 to 15 pounds, and sit and stand for a half-hour each.  [R. 9-2, Tr. 66; R. 9-6, Tr. 267; 272].  According to Mansfield,

---

[1] Mansfield does not challenge the ALJ's evaluation of her obesity and thus the Court does not further address her weight.

3

she suffers from bipolar disorder and depression, which cause mood swings and affect her ability to get along with others, concentrate and complete tasks.  [R. 9-2,Tr. 68-69; 72-73; 79-80; R. 9-6, Tr. 251; 272].  She reported not handling stress well.  [R. 9-6, Tr. 273].  Finally, she testified to having approximately one migraine headache every two weeks, requiring her to lie down for an hour or two.  [R. 9-2, Tr. 75-77].

Mansfield's day consists of caring for her children, doing light housework and preparing meals.  [R. 9-6, Tr. 268-69].  She has no problem with personal care, but has difficulty sleeping due to pain.  [*Id.,* Tr. 268].  She shops weekly for food, and drives her children to school and to appointments.  [*Id.,* Tr. 270-71].  At the time of her appeal, she reported an increase in back pain resulting in a prohibition on all lifting.  [*Id.,* Tr. 305].  She was not taking any pain or psychotropic medication at that time due to a pregnancy.  [*Id.*].

2.   *Medical Evidence*

a.   *Mental Conditions*

i.   *Treating Sources*

Mansfield's mental health records begin in January 2009, when primary care physician Dr. Bodrie described her as having a history of depression that improved with Wellbutrin.  [R. 9-9, Tr. 839].  She was

4

instead using Celexa by November of that year, but it caused her seizure-like symptoms and she returned to using Wellbutrin.  [R. 9-8, Tr. 604, 606, 609, 612, 618; 733-34].

In January 2010, Mansfield underwent a psychiatric evaluation by Dr. Ann Tadeo of the M.P.A. Group NFP, LTD.  [*Id.*, Tr. 733-34].  Mansfield described her history of depression and anxiety, which improved with Wellbutrin; a family history of bipolar disorder and suicide; a history of suffering from physical, emotional and verbal abuse throughout her life from multiple abusers; and a host of other life stressors.  [*Id.,* Tr. 733].  She told Dr. Tadeo that she had been placed on medical leave from work due to kidney stones.  [*Id.*].  Dr. Tadeo diagnosed Mansfield with bipolar disorder, issued her a Global Assessment of Functioning ("GAF") score of 45-50,[2] suggested that Mansfield receive a doubled prescription for Wellbutrin and Desyrel for insomnia.  [*Id.,* Tr. 734].  During subsequent visits, nurse practitioner Phil Sweet of the M.P.A. Group found that Mansfield continued

---

[2] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below.  Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning."  *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted).  Scores in the range of 61-70 indicate some mild symptoms.  *Karger v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 739, 745 (6th Cir. 2011).

to have a GAF of 50.  [R. 9-8, Tr. 741; 745].

While Mansfield initially felt worse on her new dosage, her symptoms improved when the M.P.A. Group added a mood stabilizer to the regimen. [R. 9-8, Tr. 735, 739, 741].  Over the course of the next year, Mansfield reported to Sweet that she was doing well on her medications, although she was noncompliant sometimes.  [*Id.,*Tr. 741-44].  In January 2011, she began therapy with a social worker at the M.P.A. Group, and reported that she had been doing well.  [R. 9-9, Tr. 799].

Also in January 2011, Dr. Tadeo completed a mental residual functional capacity ("RFC") assessment, finding Mansfield moderately limited in her abilities to remember locations and work procedures, and to understand and carry out one or two-step instructions, and markedly limited in her abilities to understand and carry out detailed instructions, and to maintain attention and concentration for extended periods.  [R. 9-7, Tr. 570].  Mansfield was moderately limited in her ability to maintain a schedule, work without supervision or distraction, make simple work-related decisions and complete a normal workday without interruption from her symptoms.  [*Id.,*Tr. 571].  She was further moderately limited in her ability to interact with co-workers and the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially

appropriate behavior and basic standards of cleanliness; respond to changes or set realistic goals; take appropriate precautions from normal hazards; and travel in unfamiliar places or use public transportation.  [*Id.*].

In a psychological examination report dated February 2011, Dr. Tadeo detailed her observations and findings, including that Mansfield reported being persistently depressed, and vacillated between being happy and elated one minute, and irritable and angry the next.  [*Id.*, Tr. 572]. While Mansfield was being provided biweekly treatment, she "misses numerous appointments, mostly because she forgets them." [*Id.,* Tr. 573]. Dr. Tadeo noted that, during a mental status examination, Mansfield was pleasant and cooperative, but her mood was irritable with congruent affect. [*Id.*].  Mansfield's concentration, focus and memory were fair, as were her insight and judgment.  [*Id.*] Dr. Tadeo reiterated that Mansfield suffered from bipolar disorder and maintained a GAF score of 50.  [*Id.*].  It appears Dr. Tadeo also completed a medical needs-JET form for Mansfield, diagnosing her with bipolar disorder, but the remainder of the form is not completed, and there appears to be a second page that is missing.  [*Id.*, Tr. 575].

During a May 2011 medication review, Dr. Tadeo indicated that Mansfield remained on her medications into May 2011, and that she was

"ornery" when she missed doses.   [R. 9-8, Tr. 746].   By July 2011, Mansfield was not taking any mediation due to her pregnancy.   [R. 9-9, Tr. 825].   After reporting that she was experiencing significant difficulties in August 2011, her obstetrician again started her on a mood stabilizer and she felt improvement by her next visit the following month.   [R. 9-9, Tr. 766-67].   During the course of Mansfield's therapy in 2011, she described numerous life problems and often being stressed, and expressed that treatment was helping overall.   [*Id.*, Tr, 800-35].   Nonetheless, she regularly missed appointments, including the final two that were scheduled in November and December.   [*Id.*].

ii.      *Consultative and Non-Examining Sources*

Mansfield underwent a consultative psychological examination with Dr. Michael Brady on June 2, 2011, where she reported that she suffered from bipolar disorder with depressive symptom that were present for the past five years.   [R. 9-7, Tr. 470].   According to Dr. Brady's report, Mansfield described her years of physical abuse, and represented that she left work as a cashier in 2008 because she relocated.   [*Id.,* Tr. 471].   He observed Mansfield to have a depressed mood, and to be accurately reporting her symptomology.   [*Id.*, Tr. 471-72].   A mental status exam resulted in a diagnosis of recurrent, moderate major depressive disorder,

8

learning disorder and borderline personality disorder, and Dr. Brady issued Mansfield a GAF score of 60. [*Id.*, Tr. 473]. He opined that Mansfield's ability to relate with others and maintain concentration were fair, but that she might struggle to perform complex tasks and deal with normal workplace stressors. [*Id.*].

On June 6, 2011, another consulting doctor, Joe DeLoach, Ph.D, reviewed Mansfield's records and opined that her disorder caused mild restriction in activities of daily living, moderate difficulties in social functioning and moderate limitations in the ability to maintain concentration, persistence and pace. [R. 9-3, Tr. 95]. Dr. DeLoach found Mansfield to be moderately limited in her abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and work with others and accept criticism and supervision, but that she could complete simple tasks on a sustained basis. [*Id.*, Tr. 98-99].

### b.   Physical Conditions

### i.   Treating Sources

The first record of Mansfield complaining of lower back pain is from 2007, when she was pregnant. [R. 9-9, Tr. 878]. Dr. James Bodrie opined that the pain would likely resolve after delivery. [*Id.*]. When she complained about lower back pain again in January 2009, Dr. Bodie was

not sure whether the pain was secondary to kidney stones. [*Id.*, Tr. 839].

A lumbar x-ray taken a year later was negative. [R. 9-7, Tr. 457]. In March

2010, Mansfield sought treatment for back pain at an urgent care clinic

because she was out of pain medication. [*Id.*, Tr. 554-60). An exam

revealed tenderness and a decreased range of motion ("ROM") due to pain

with a negative straight leg raising test, and she was prescribed Vicodin for

lower back pain and sacroiliac joint dysfunction. [*Id.*, Tr. 554-55].

    When Dr. Bodrie examined Mansfield in April 2010 and she winced

with even a light touch to her low back, he questioned her credibility. [R. 9-

9, Tr. 849]. However, an MRI taken after that appointment revealed a

diffuse disc bulge at L5-S1 with impression upon the ventral thecal sac, but

no canal stenosis and no nerve root impingement. [R. 9-7, Tr. 456]. Given

the abnormal MRI and continued symptoms, Dr. Bodrie referred her to a

pain clinic in April 2010 . [R. 9-9, Tr. 851]. Mansfield requested that Dr.

Bodie prescribe work restrictions, but there is no indication he did. [*Id.*].

Dr. Bodie had issued no-work prescriptions for Mansfield from December

2009 to February 2010, but Mansfield told Dr. Tadeo that that medical

leave was due to kidney stones. [R. 9-7, Tr. 584-87; R. 9-8,Tr. 733].

    Pain clinic physician Dr. Sam Morkon began treating Mansfield in

May 2010. He diagnosed her with facet joint arthropathy and degenerative

disc disease and scheduled her for epidural steroids.   [R. 9-8,Tr. 621-22].

Over the next two months, she received a series of epidural steroid

injections, but her response was poor, so she was prescribed Mobic (an

anti-inflammatory pain medication) and physical therapy.  [*Id.,* Tr. 624-30].

Nonetheless, there is no indication in the record that she received physical

therapy.

In July 2010, Mansfield went to the emergency room complaining of

back pain.  [R. 9-8,Tr. 672].  The examining physician assistant (PA) found

that Mansfield's back was not tender to palpation and had a full range of

motion, and a straight leg raising test was negative.  [*Id.*]  The PA's clinical

impression was acute exacerbation of chronic lower back pain, for which

she gave Mansfield an injection of Toradol and Norflex, as well as other

medications for home treatment of the pain and inflammation.  [*Id.*, Tr. 672-

73].  That same month, when she established a treating relationship with

Dr. Albert Yong, he noted tenderness in her lumbar spine.  [R. 9-7, Tr. 429].

In August 2010, Mansfield returned to the emergency room

complaining of back pain following a fall.  [R. 9-8, Tr. 689-94].  An exam

revealed muscle spasms and decreased range of motion secondary to

pain, but a lumbar x-ray was normal.  [*Id.,* Tr. 690 & 696].  She was given

Toradol, Norflex and Tylenol #3.  [*Id.*, Tr. 691].  Mansfield saw Dr. Yong

11

three more times in August for her back pain.  His records indicate that she was feeling better by the end of the month, but was still mildly tender.  [R. 9-7, Tr. 424-26].

In December 2010, Mansfield went to the emergency room after a car accident and was diagnosed with an acute lumbar strain.  [R. 9-8, Tr. 706-12].  When she complained of continuing back pain from the accident at urgent care the following week, an exam revealed a tender lumbar spine, a normal gait and no neurological deficits, and she was prescribed Toradol, Ultram and Flexeril.  [R. 9-7, Tr. 499-503].  On December 22, 2010, Dr. Yong treated Mansfield for back pain radiating to her right leg.  [*Id.*, Tr. 414-17].  Although he found no sensory deficits, he noted that her spine was tender, that a straight leg raising test was positive at 45 degrees on the left, and that she reported difficulty walking sometimes.  [*Id.*, Tr. 416].  Dr. Yong concluded that Mansfield's acute low back pain had deteriorated, and prescribed Vicodin.  [*Id.*].  Mansfield returned to the emergency room in January 2011 complaining of back pain and leg numbness, and she was given Toradol and released with a steady gait.  [R. 9-8, Tr. 713-18].

Mansfield was evaluated by neurosurgeon Dr. S. T. Chakravarthi that same month.  [R. 9-9, Tr. 779].  The exam revealed a normal gait except some left leg limp, no neurological deficits and a negative straight leg

12

raising test. [*Id.*]. The doctor recommended a repeat MRI and opined that surgery was not likely to improve Mansfield's outcome. [*Id.*]. The January 28, 2011, MRI that followed and that was compared with the April 2010 study showed, at L5-S1, stable mild degenerative disc disease, a mild annular tear, stable mild disc bulging and stable mild bilateral arthropathy. [*Id.*, Tr. 781]. A bone scan conducted the same day was normal. [*Id.,* Tr. 783]. Dr. Chakravarthi wrote Dr. Yong a letter on February 8, 2011, noting that the MRI scan showed no change and that surgery was not a viable option due to its high failure rate. [*Id.*, Tr. 785]. He recommended conservative treatment including pain injections, although those did not help Mansfield previously. [*Id.*]. Dr. Chakravarthi concluded, "At present, I think she is disabled because of the pain." [*Id.*].

Dr. Yong saw Mansfield two days later, and observed tenderness in her lumbar spine, a straight leg restriction at 45 degrees on the left, but no sensory deficit. [R. 9-7, Tr. 412-13]. His impression was that her acute low back pain was unchanged, and prescribed Vicodin to be taken twice daily. [*Id.,* Tr. 413]. Dr. Yong filled out a medical needs form for Mansfield the same day, opining that she is disabled from all work "for now" and was being referred to a specialist. [*Id.*, Tr. 578-79]. Dr. Yong believed that Mansfield's condition was stable; it was not improving or deteriorating.

13

[*Id.*].

In an accompanying medical needs-JET form, Dr. Yong opined that Mansfield was disabled from work for six months and that her restrictions included only occasional lifting of ten pounds or less, and sitting less than six hours a day.  [*Id.*, Tr. 582].  Confusingly, Dr. Yong checked three different boxes with regard to her ability to sit and stand, stating she was simultaneously capable of standing/walking less than two hours, at least two hours, and at least six hours a day.  [*Id.*].  It appears that he may have attempted to cross out the latter time period.  [*Id.*]  Adding more confusion, the second page of this form is missing from the record, but the accompanying cover letter indicates that Dr. Yong certified that Mansfield needed medical assistance with meal preparation, shopping, laundry, and housework, and that she could not participate in Work First because she would be required to sit too long.  [*Id.*, Tr. 577].

Mansfield next saw Dr. Yong relative to her back pain in June 2011, when she requested that he fill out a form for her disability application.  [R. 9-9, Tr. 789-90].  At that time, she reported no pain and her spine was only mildly tender with no neurological deficit.  [*Id.*].  During this same period of time, Mansfield was being followed for her pregnancy by her obstetrician Dr. Douglas Saylor.  In May, 2011, Dr. Saylor permitted Mansfield to start

14

walking for exercise, gradually working up to a distance of two miles, as
tolerated.  [*Id.,* Tr. 761].  However, the following month, she reported back
pain and was diagnosed with sacroiliac dysfunction, so Dr. Saylor
prescribed a back brace.  [*Id.,* Tr. 762].

In November 2011, a physician assistant at Dr. Yong's office treated
Mansfield for back pain after the birth of her baby.  [*Id.,* Tr. 787; 791-93].
An exam revealed a grossly intact range of motion and mild tenderness
with a negative straight leg raising test.  [*Id.,* Tr. 792].  The PA informed
Mansfield that her back issues did not warrant narcotic treatment, and
instead prescribed an anti-inflammatory, a medication to treat numbness
and tingling symptoms, and physical therapy.  [*Id.*, Tr. 791; 793].

Mansfield was also treated for headaches six times in 2009 and once
in 2010.  [R. 9-7, Tr. 392-98, 514-24; R. 9-8, 593-600, 604-605, 609, 611-
14; R. 9-9, Tr. 840-44].  Migraine was the diagnosis at three of these
appointments, while the others resulted in diagnoses including tension
headaches, sinusitis and medication side effects.  [*Id.*].  She reported
improvement in symptoms with Mobic and Ultram.  [R. 9-9, Tr. 841].  CT
scans and brain MRIs taken during this period all yielded normal results.
[R. 9-7, Tr. 451, 464, 466-67; R. 9-8, Tr. 601).  An EEG conducted to rule
out epilepsy revealed rare left temporal slow waves, but no doctor

15

connected this to Mansfield's headaches.  [R. 9-7, Tr. 461-63].

### ii.    Consultative and Non-Examining Sources

R. Scott Lazzara M.D. conducted a physical consultative exam of Mansfield on June 15, 2011.  [*Id.,* Tr. 476-80].  According to his report, Mansfield said that she stopped working in 2008 due to back pain, that she was able to sit for ten minutes, stand and walk for fifteen and that she was restricted from lifting more than ten pounds.  [*Id.,* Tr. 476].  Dr. Lazzara found that Mansfield had a slightly reduced range of motion in the dorsolumbar spine and walked with a mild limp, but otherwise had normal musculoskeletal functioning.  [*Id.,* Tr. 477-80].  He opined that Mansfield's "degree of impairment appears mild, and that the only treatments warranted in light of her pregnancy were therapy and anti-inflammatories." [*Id.*, Tr. 480].

### C.    The ALJ's Application of the Disability Framework

DIB and SSI are available for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. § 1520(a)(4); 20 C.F.R. § 416.920(a)(4).[3]  Second, if the claimant has not had a severe impairment or a combination of such impairments[4] for a continuous period of at least 12 months, no disability will be found.  *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled.  *Id.*  If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work.  *Id.*  At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work.  *Id.*  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached.  *Preslar v.*

---

[3] Sections 1520(a)(4) and 920(a)(4), which pertain to DIB and SSI respectively, list the same five-step analysis.

[4] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 1520(c); 920(c).

17

*Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following the five-step sequential analysis, the ALJ concluded that Mansfield was not disabled.  At Step One, she determined that Mansfield had not engaged in substantial gainful activity since her alleged onset date. [R. 9-2, Tr. 38].  At Step Two, the ALJ found the following severe impairments:  "bipolar disorder, learning disorder not otherwise specified, obesity, migraine headaches, mild degenerative disc disease of L5-S1, and stable mild disc bulging at L5-S1 slightly eccentric to the left with mild facet arthropathy."  [Id.].  At Step Three, she concluded that none of Mansfield's impairments, either alone or in combination, met or medically equaled a listed impairment, specifically comparing them to Listings 1.04 (Disorders of the spine), 11.00 (Neurological), 12.02 (Organic mental disorders), and 12.04 (Affective disorders).  [*Id.,* Tr. 39-41].

The ALJ determined that Mansfield had mild restrictions in activities of daily living, moderate restrictions in social function and moderate limitations in maintaining concentration, persistence and pace with no episodes of decompensation.  [*Id.*]  The ALJ then assessed Mansfield's residual functional capacity (RFC), finding her capable of light work

> except that she can only occasionally balance, bend, stoop, kneel , crouch, or crawl . . . only occasionally climb stairs and ramps but never climb ladders, ropes or scaffolds [and] would be limited to simple, routine and repetitive tasks involving no

18

> more than simple work related decisions [and] only occasional
> interaction with the public, coworkers, and supervisors.

[*Id.*, Tr. 42].  Based on this RFC, the ALJ determined at Step Four that

Mansfield could not engage in any of her past relevant work.  [*Id.*, Tr. 50].

However, at Step Five, the ALJ determined, with the assistance of VE

testimony, that there were a significant number of jobs in the national

economy that a hypothetical claimant like Mansfield could perform given

her age, education, vocational experience and RFC.  [*Id.*, Tr. 51-52].  The

VE testified that such a hypothetical claimant could perform the jobs of

machine tender (7,800 jobs in the state), light assembly (14,000 jobs) or

line attendant (4,800 jobs).  [*Id.*, Tr. 51].

## II.    STANDARD OF REVIEW

Pursuant to § 405(g), this Court's review is limited to determining

whether the Commissioner's decision is supported by substantial evidence

and was made in conformity with proper legal standards.  *Gentry v. Comm'r*

*of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

(6th Cir. 2007) (internal quotation marks and citation omitted).  Only the

evidence in the record below may be considered when determining

19

whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards.  "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings."  *Gentry*, 741 F.3d  at 723.  *See also Rogers*, 486 F.3d at 249.  In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight."  *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

When the Commissioner has failed to adhere to its procedures, the harmless error standard applies and reversal is not warranted unless the claimant has been prejudiced or deprived of substantial rights.  *Rabbers v.*

*Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless.  *Id.* at 655-56.  On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless.  *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729.  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-40 (internal quotation marks and citation omitted).

With these standards in mind, this Court finds that the ALJ's determination that Mansfield is not disabled is supported by substantial evidence.

### III.   ANALYSIS

In her motion for summary judgment, Mansfield argues that the ALJ failed to give sufficient weight to the opinions of her treating psychiatrist, primary care physician and neurosurgeon, and to the lay opinion of her boyfriend.  She further argues that the ALJ's RFC is not supported by substantial evidence.  The Court finds that Mansfield's claim of errors regarding the weighing of Dr. Tadeo's opinion and the ALJ's RFC have merit requiring remand.

21

###### A.    Treating Physician Rule

Mansfield argues that the ALJ's assessment of her treating physician's opinions contravenes the requirements of the treating physician rule.  The "treating physician rule" requires an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43.  "Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors," and give appropriate weight to the opinion.  *Gentry*, 741 F.3d at 723.  In all cases, a treating physician's opinion is entitled to great deference.  *Id.*

When declining to give a treating physician's opinion controlling weight, an ALJ must provide good reasons.  "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons

22

for that weight.'" *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *5).

Mansfield argues that the ALJ gave inadequate consideration to Dr. Tadeo's mental RFC. [R. 9-7, Tr. 570-71]. The Court agrees. The ALJ described Dr. Tadeo's medical RFC as stating that "the claimant was markedly limited in her ability to understand and remember detailed instructions, in her ability to carry out detailed instructions, and in her ability to maintain attention and concentration for extended periods." [R. 9-2, Tr. 48]. She did not describe Dr. Tadeo's many other restrictions, including the moderate limitations that she placed on Mansfield's ability to maintain a regular schedule, work without supervision or distraction, make simple work-related decisions, complete a normal workday without interruption from her symptoms, interact with co-workers and the general public, accept instructions and respond appropriately to criticism from supervisors. [R. 9-7, Tr. 570-71]. Additionally, the ALJ never assigned any weight to Dr. Tadeo's opinion, or gave good reasons for refusing to assign it controlling weight. Instead, the ALJ gave "great weight" to the mental health opinion of Dr. Brady, the consulting examiner, that Mansfield "could relate and interact with others, including coworkers and supervisors," and that her "ability to maintain concentration was fair." [Id.].

23

Violation of the treating physician rule may sometimes result in only harmless error, such as when the opinion is patently deficient, where the violation was *de minimus*, or where the goals of the procedural protection are otherwise met despite the lack of compliance.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  None of those exceptions exist here.

The error here is not *de minimus* because, if Dr. Tadeo's opinion were given controlling weight, Mansfield would necessarily be found to require additional restrictions that might result in finding that there are not a sufficient number of jobs in the workplace she could perform.  Specifically, Dr. Tadeo's findings call into question Mansfield's ability to perform simple, routine tasks, to make simple work related decisions and to work with limited supervision, as required by the ALJ's RFC.  Additionally, although the Commissioner argues that Dr. Tadeo's opinion is patently deficient, it contradicts itself by conceding that the ALJ incorporated some of Dr. Tadeo's restrictions in her RFC.

The Commissioner's argument that the ALJ implicitly weighed Dr. Tadeo's opinion, thereby meeting the goal behind the procedural safeguard, lacks merit.  First, the treating physician rule "is not simply a formality," but is a safeguard put in place to inform otherwise bewildered

24

claimants why their physicians' opinions were rejected and to permit
meaningful review on appeal. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.
2011). Further, since the ALJ's analysis reached the fifth step, she had the
burden to accurately assess Mansfield's impairments. *Howard v. Comm'r
of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002). The Commissioner cannot
carry its burden by implication. Moreover, there is no evidence in the ALJ's
opinion of an implicit attack on Dr. Tadeo's opinion; the ALJ never once
challenged Dr. Tadeo's findings in light of the other evidence in the record.
This error, therefore, requires remand.

### B. RFC for Light Work

When testifying that Mansfield could perform other jobs, the VE relied
upon a hypothetical that incorporated the ALJ's finding that Mansfield had
an RFC that allowed for light work, with no restrictions on the substantial
periods of walking, standing or sitting presumed under that classification.
20 C.F.R. §§ 404.1567(b), 416.967(b). The RFC for light work also
assumes that Mansfield is capable of lifting up to 20 pounds and to
frequently lift 10 pounds. *Id.* Thus, the Commissioner has the burden to
demonstrate by substantial evidence in the record that Mansfield has the
capacity for substantial periods of walking, standing or sitting without
limitation, for lifting up to 20 pounds, and for lifting 10 pounds frequently.

25

*Howard*, 276 F.3d at 238.

Mansfield argues that the ALJ improperly gave insufficient weight to the opinions of Dr. Chakravarthi and Dr. Yong that she was disabled, and to Dr. Yong's restrictions as outlined in his February 2011 JET form. [R. 9-9, Tr. 785; R. 9-7, Tr. 578-79, 582]. Mansfield further faults the ALJ for not considering the missing second page of Dr. Yong's medical needs-JET forms, for inferring from an unchecked box that Dr. Yong meant that Mansfield was no longer disabled from performing any work activity, and for failing to clear up the ambiguity in the form caused by Dr. Yong checking off boxes indicating both that Mansfield could stand for no more than two hours and that she could stand up to six hours. As a result, Mansfield argues, the ALJ erred by failing to incorporate Dr. Yong's limitations in her RFC. The Court agrees that there are obvious gaps in the record that the ALJ should have addressed, that the ALJ did not give good reasons for not following Dr. Yong's weight and sitting restrictions, and that the ALJ's RFC is not supported by substantial evidence in the record.

Ordinarily, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 214 (6th Cir. 1986). However,

26

"[w]here there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence." *Kendall v. Astrue*, No. CIV.A. 2:10-263-DCR, 2011 WL 4388794, at *5 (E.D. Ky. Sept. 20, 2011).  This duty arises from the fact that Social Security proceedings are not adversarial, so the ALJ must "investigate facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Courts evaluate whether an ALJ has failed to fully develop the record on a case-by-case basis.  *Umara v. Comm'r of Soc. Sec.*, No. 2:12-CV-1119, 2013 WL 6001003, at *4 (S.D. Ohio Nov. 12, 2013), *adopted by* 2014 WL 116370 (S.D. Ohio Jan. 10, 2014).  "As long as there is sufficient evidence in the record for him to make a decision regarding the claimant's disability, it is within the discretion of an ALJ to close the record." *Penn v. Comm'r of Soc. Sec.*, No. 1:10CV1885, 2012 WL 646057, at *8 (N.D.Ohio Feb.28, 2012).

Of further import, while it is true that the determination of disability is reserved for the Commissioner and the ALJ was not required to give controlling weight to Mansfield's treating physicians' opinions that she is disabled, the ALJ was still required to carefully consider those opinions and to seek clarification when needed.

> [O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including

27

opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96–5p, 1996 WL 374183, at *2.  *See also Ferguson v. Comm'r*, 628 F.3d 269, 273 (6th Cir.2010) (recontact required when ALJ finds that treating physician's opinion is not supported by evidence in the record, but the ALJ is uncertain about the bases for the opinion).

In this case, the ALJ gave little weight to the opinions of Dr. Yong and Dr. Chakravarthi that Mansfield was disabled, finding simply that their opinions were "inconsistent with credible medical evidence of record," and that Dr. Yong's opinion was ambiguous with respect to Mansfield's walking and standing restrictions.  [R. 9-2, Tr. 46].  The ALJ appears to have opined that Manfield's diagnoses of mild degenerative disc disease, stable mild bulging disc and stable mild bilateral facet arthropathy rendered her symptoms mild and her functional abilities mildly limited.  [R. 9-2, Tr. 50]. However, Dr. Yong found that Mansfield's conditions caused "acute" low back pain, and by "stable" he meant neither deteriorating *nor improving*. [R. 9-7, Tr. 412-13, 578-79].  Dr. Chakravarthi likewise determined that that Mansfield's "mild" bulging disc caused disabling pain.  [R. 9-9, Tr. 779].  In violation of SSR 96–5p, the ALJ failed to carefully consider that Drs. Yong

and Chakravarthi believed that Mansfield's objectively determined medical conditions could cause her acute pain before finding that she could walk, stand or sit without restrictions.

The ALJ also failed to recontact Dr. Yong for clarification regarding the bases for his opinions that she found ambiguous, contrary to the directive of SSR 96-5p. She further ignored the gap in the record created by the missing second page to Dr. Yong's JET form. That gap should have been obvious to the ALJ because the cover letter accompanying the form stated that Dr. Yong certified that Mansfield had a medical need for assistance with meal preparation, shopping, laundry, and housework, and that she could not participate in Work First because she would be required to sit too long. [R. 9-7, Tr. 577]. 20 C.F.R. § 404.1527(c)(2); *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43.

Instead of seeking to clarify Dr. Yong's JET's form, the ALJ used the ambiguity as a reason to assign little weight to his opinion despite the fact that he was a treating physician. [R. 9-2, Tr. 46]. The ALJ's failure to clarify Dr. Yong's ambiguous restrictions in violation of SSR 96-5p cannot be considered a "good reason" for not giving Dr. Yong's opinion controlling weight.

Moreover, the ALJ was required give sufficiently specific reasons for

not giving controlling weight to Dr. Yong's opinion that Mansfield could lift

only ten pounds occasionally and could sit for no more than six hours a

day. *Blakley*, 581 F.3d at 406-07.  In conclusory manner, the ALJ stated

that Dr. Yong's opinion was contradicted by credible medical evidence of

record, but she cited no such medical evidence that would support her

finding that Mansfield can lift up to twenty pounds and up to ten pounds

frequently, or could sit for more than six hours.

Nor did the ALJ cite medical evidence to establish that Mansfield

could walk or stand without restriction.  This omission was contrary to the

requirement that the ALJ provide a narrative discussion to support each

conclusion.

> The RFC assessment must include a narrative discussion describing
> how the evidence supports each conclusion, citing specific medical
> facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily
> activities, observations).  In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work activities in
> an ordinary work setting on a regular and continuing basis (i.e., 8
> hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the
> individual can perform based on the evidence available in the case
> record.  The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record
> were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).  Here,

the ALJ did not discuss at all the bases for her opinions that Mansfield was

able to perform the standing, walking, sitting or lifting required by light work

in an ordinary work setting on a regular and continuing basis.

Moreover, instead of relying on medical expertise, the ALJ took it upon herself to frame an RFC by evaluating the "relatively normal findings" from Mansfield's clinical examinations.  [R. 9-2, Tr. 50].  In this regard, the ALJ erred by "playing doctor."  *Allen v. Comm'r of Soc. Sec.,* No. 12–15097, 2013 U.S. Dist. LEXIS 150236, *44–45, 2013 WL 5676254 (E.D.Mich. Sept. 13, 2013) *adopted by* 2013 U.S. Dist. LEXIS 149851, 2013 WL 5676251 (E.D.Mich. Oct. 18, 2013).  "[C]ourts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data."  *Id.* (collecting cases).  When, as here, the claimant suffers from well-documented impairments, "an expert medical advisor is necessary to properly evaluate plaintiff's impairments, symptoms and functional limitations."  *Id.* at *16.

Notably, Dr. Lazzara, the consultant whose opinion the ALJ appeared to give great weight despite never saying so [see R. 9-2, 45 & 50], rendered no opinion regarding Mansfield's abilities to walk, stand, sit or lift weight.  [R. 9-7, 476-80].  Given the requirements of S.S.R. 96–8p for evidence supporting each conclusion, Dr. Lazzara's conclusion that Mansfield's "impairment appears mild" is too vague to support the ALJ's

31

RFC.  The ALJ's greater reliance on Dr. Lazzara instead of Mansfield's treating physicians was clear error, since he examined her only once and did not review the results of her MRI studies.  [*Id.*]  *See* 20 C.F.R. § 404.1527(d)(2) (treating sources provide a longitudinal picture of medical impairments than cannot be obtained from consultants).

The ALJ ostensibly relied in part on Mansfield's description of her activities of daily living to conclude that she is "not as limited as one would expect," stating:

> The claimant is apparently able to care for multiple young children at home, which can be quite demanding both physically and emotionally, without great assistance.  The claimant reported in her function reports that she is able to clean up the house, perform personal care activities, cook, shop, drive, walk for a long time, and watch television.

[R. 9-2, Tr. 50].  However, contrary to the ALJ's portrayal of Mansfield as an active mother, Mansfield indicated that she has difficulty driving long distances because sitting for too long hurts her back; that she cannot stand for too long; that she needs help to lift her children and other heavy objects, and/or she experiences pain; that she can do a few chores around the house, but washing a sink full of dishes, vacuuming and sweeping hurt her back; that she often has help preparing food; that she needs breaks while performing household chores; and that she shops only a couple of times a month.  [R. 9-2, Tr. 65-66, 70-71; R. 9-6, Tr. 219-222].  Mansfield did

represent that she could walk for a long time, but that was in a questionnaire that she signed on August 18, 2008, well before she began treating with Dr. Yong and well before the January 4, 2012 hearing. [R. 9-6, Tr. 224]. Regardless, Mansfield unequivocally described limitations on her ability to sit or stand for long periods of time and to lift much weight, so the ALJ's ostensible reliance on Mansfield's description of her daily activities to justify a RFC allowing for the sitting, standing and demands of light work cannot be justified.[5]

For these reasons, this Court recommends that this matter be remanded in order for the ALJ to clarify whether or not Mansfield's treating physicians believe that her back ailments allow for walking, standing and sitting without limitation, and for lifting up to 20 pounds and up to 10 pounds frequently. If not, and if there is no medical evidence to the contrary, the ALJ should pose a new hypothetical to the VE that incorporates the necessary additional limitations.

### C.    Mansfield's Other Alleged Errors

The Court notes for the record that Mansfield's other alleged errors

---

[5] The Court also disagrees with the ALJ's statement that Mansfield's boyfriend's is "entirely inconsistent" with her statements regarding her limitations. [AR 9-2, Tr. 46-47]. While there are some distinctions between their statements, John Taylor's description of Mansfield's daily activities, and difficulties with standing, cleaning and lifting have some consistency with Mansfield's testimony. [AR 9-6, Tr. 291-298].

do not warrant reversal.  First, her claims that the ALJ erred in not considering various doctors' GAF scores is without merit.  The Sixth Circuit has routinely held that while GAF scores are helpful, they are not required to be incorporated into an RFC in order for it to be accurate.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009); *see also* 65 Fed. Reg. 50746, 50764-65 (2000).

The ALJ also did not err in not imposing any specific limitations regarding Mansfield's headaches.  Mansfield herself noted that these headaches had decreased in frequency over time, and the medical records showed she was last treated for them in 2010, almost two years prior to the hearing, [R. 9-2, Tr. 75-77] and none of Mansfield's doctors mentioned her headaches or issued limitations as a result of them.

IV.    CONCLUSION

The Court finds that the ALJ erred insofar as she failed to follow the treating physician rule with regard to Dr. Tadeo's opinion evidence, and that substantial evidence does not support an RFC that includes light work. For this reason, the Court **RECOMMENDS** that Mansfield's Motion for Summary Judgment **[R. 16]** be **GRANTED IN PART** to the extent it seeks remand but **DENIED IN PART** to the extent it seeks reversal and award of

benefits, the Commissioner's Motion **[R. 19]** be **DENIED** and this case be **REMANDED** for further consideration consistent with this Report and Recommendation.

> s/Elizabeth A. Stafford
> ELIZABETH A. STAFFORD
> United States Magistrate Judge

Dated: April 17, 2015

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 17, 2015.

<u>s/Marlena Williams</u>
MARLENA WILLIAMS
Case Manager